AO 106 (Rev. 04/10) Application for a Search Warrant (requesting AUSA Debra Jaroslawicz)

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH DR. NEIL ANAND<br>THAT IS STORED AT PREMISES CONTROLLED BY<br>MD SCRIPTS | Case No. 20-77-M |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A

located in the _____ District of ____Colorado____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1347 | Health Care Fraud |
| 21 USC 846 | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:
See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Zabrina Zitter, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Jan 21, 2020

City and state: Philadelphia, PA

*Judge's signature*

Honorable Lynne A. Sitarski, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH DR. NEIL ANAND THAT IS STORED AT PREMISES CONTROLLED BY MD SCRIPTS | Case No. _20-77-M_ <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Zabrina Zitter, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by MDScripts, a clinical dispensing software provider headquartered at 4735 Walnut Street, Suite 110, Boulder, CO 80301 (the "Subject Premises"). The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require MDScripts to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      I am a Special Agent with United States Department of Health and Human Services' Office of Inspector General ("HHS-OIG"), Office of Investigations, and have been since January 2011. My duties and responsibilities include conducting criminal investigations of individuals, organizations, and businesses that have violated federal laws, including, but not limited to, Title 18, United States Code, § 371 (Conspiracy to Defraud the United States), 18

U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1349

(Conspiracy to Commit Health Care Fraud and Wire Fraud), 21 U.S.C. § 841 (Distribution of

Controlled Substances), and 42 U.S.C. § 1320a-7b(b) (Illegal Remunerations).

     3.     I have participated in a variety of criminal health care fraud investigations, during

the course of which I have interviewed witnesses, conducted physical surveillance, executed

search warrants, and reviewed records, including claims data, bank records, phone records,

medical records, invoices, and other business records. I am familiar with the records and

documents maintained by health care providers and the laws and regulations related to the

administration of the Medicare program.

     4.     The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended

to show that there is sufficient probable cause for the requested warrant and does not set forth all

of my knowledge about this matter.

     5.     Based on my training and experience, the training and experience of other HHS-

OIG personnel with expertise in electronic information and stored communications, and the facts

as set forth in this affidavit, there is probable cause to search the information described in

Attachment A for evidence of crimes and contraband or fruits of crimes, as described in

Attachment B, specifically violations of Title 18, United States Code, § 371 (conspiracy to

defraud the United States), Title 18, United States Code, § 1343 (wire fraud); Title 18, United

States Code, § 1347 (health care fraud); Title 18, United States Code, § 1349 (conspiracy to

commit health care fraud and wire fraud), and Title 21, United States Code §§ 841(a)(1) and 846

(conspiracy to distribute controlled substances), among other statutes.

## II.    JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## III.   BACKGROUND

### A. The Relevant Health Insurance Programs

7.      Medicare is a federally-funded health care program that provides benefits to persons who are at least 65 years old or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Medicare is divided into multiple parts: Part A covers hospital inpatient care, Part B covers physicians' services and outpatient care, Part C is Medicare Advantage Plans, and Part D covers prescription drugs.

8.      A medical provider is required to enroll with the Medicare program in order to submit claims for payment to CMS. To enroll in the Medicare program, a medical provider is required to enter into an agreement with CMS in which the provider agrees to comply with all applicable statutory, regulatory, and program requirements for reimbursement from Medicare. By signing the Medicare enrollment application, the provider certifies that the provider understands that payment of a claim is conditioned on the claim and the underlying transaction

complying with Medicare regulations,[1] Medicare program instructions, the law, and on the provider's compliance with all applicable conditions of participation in Medicare.

9.      Medicare covers prescriptions that are obtained from a state licensed physician, or other appropriately licensed health care provider, who is registered as required with the DEA. Medicare requires that any drug prescribed by a participating provider must be safe and effective and otherwise reasonable and necessary and will only reimburse for claims for prescriptions that were prescribed within the course of professional practice and for a legitimate medical purpose. Generally, the pharmacy submits the claim to Medicare for the prescription medication using the information contained in the prescription, such as prescribing physician's name, patient information, drug, strength, and quantity dispensed. Medicare relies on the accuracy of the information in a claim when making payments and presumes that the underlying prescription was written within the usual course of professional practice and for a legitimate medical purpose. Medicare does not reimburse for medically unnecessary medications.

10.     The United States Office of Personnel Management ("OPM") serves as the chief human resources agency and personnel policy manager for the federal government. Among its many duties, OPM manages the Federal Employees Health Benefits Program ("FEHBP"). FEHBP benefits are afforded to all federal employees and their family members. Federal employees may choose from over 300 FEHBP contracted health insurance carriers. Benefits are administered by private insurance companies and paid for, in large part, by OPM. A medical

---

[1] There are limited exceptions to this rule, none of which are applicable to this investigation.

provider may enroll with OPM as a participating provider in order to submit claims to OPM for medical services to federal employees and their family members.

11.     The United States Department of Labor Office of Workers' Compensation Program ("OWCP") administers the federal workers' compensation program, which provides certain benefits, including health care benefits and wage loss replacement, to federal employees who sustain a work-related injury. *See* 5 U.S.C. §§ 8101, *et seq.* All providers are required to enroll with OWCP through its designated bill processing agent and may submit claims for payment under their issued provider number.

12.     Independence Blue Cross ("IBC") offers health insurance plans for individuals and families throughout southeastern Pennsylvania. IBC is the largest health insurer in the Philadelphia area and offers a wide variety of health plans, including managed care and traditional indemnity insurance. A medical provider may enroll with IBC as a participating provider in order to submit claims to IBC for medical services to federal employees and their family members.

13.     Like Medicare, OPM, OWCP, and IBC require that any drug prescribed by a participating provider must be safe and effective and otherwise reasonable and necessary and will only reimburse for claims for prescriptions for controlled substance that were prescribed within the course of professional practice and for a legitimate medical purpose by a state licensed physician, or other appropriately licensed health care provider.

**B. Relevant Statutes and Guidelines**

***Wire Fraud***

14.     It is a crime for any person, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice. See Title 18, United States Code, Section 1343.

### *Health Care Fraud*

15.    It is a crime for any person to knowingly and willfully execute, or attempt to execute, a scheme or artifice to defraud any health care benefit program, or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program. See Title 18, United State Code, Section 1347.

16.    A "health care benefit program" is any public or private plan or contract, affecting commerce, under which any medical benefit, item or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract. See Title 18, United States Code, Section 24.

17.    Title 18, United States Code, Section 1349, provides that any person who attempts or conspires to commit health care fraud shall be subject to the same penalties as those proscribed in Title 18, United States Code, Section 1347.

18.    Medicare, OPM, OWCP, and IBC are each a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

### *Title 21 and the Controlled Substance Act*

19.    The Controlled Substance Act ("CSA") governs the manufacturing, distributing, and dispensing of controlled substances in the United States. See 21 U.S.C. §§ 801-971. "A prescription for a controlled substance...must be issued for a legitimate medical purpose by an

individual practitioner acting in the usual course of his professional practice." See Title 21, C.F.R, Section 1306.04

20.     It is a crime to knowingly and intentionally distribute a controlled substance other than in the usual course of professional practice and for a legitimate medical purpose. See Title 21, U.S.C, Section 841(a)(1). It is also a crime to attempt or conspire to violate Section 841(a)(1). See 21 U.S.C. § 846

21.     The CSA classifies drugs into five schedules based on their medicinal value, potential for abuse, and safety or dependence liability. Schedule I drugs (such as heroin and LSD) have a high potential for abuse and no currently accepted medical use. Schedule II drugs (such as methadone, oxycodone, fentanyl and morphine) may be used legitimately as painkillers, but they are highly addictive and often abused. Abuse of Schedule II controlled substances may lead to severe psychological or physical dependence. Schedule III drugs (such as codeine products with aspirin), Schedule IV drugs (such as Xanax and Clonazepam), and Schedule V drugs (such as Promethazine with codeine, a cough syrup) all have medical uses and have successively lower potential for abuse and dependence. All Scheduled drugs, except those in Schedule I, are legally available to the public with a valid prescription.

*Pennsylvania Code of Professional and Vocational Standards*

22.     The Pennsylvania Code of Professional and Vocational Standards, Title 49, Chapter 16.92, defines the authority of physicians licensed in the Commonwealth of Pennsylvania to prescribe controlled substances. Chapter 16.92 provides, in pertinent part:  A person licensed to practice medicine and surgery in this Commonwealth or otherwise licensed or regulated by the Board, when prescribing, administering or dispensing controlled substances, shall carry out, or cause to be carried out, the following minimum standards:

a. *Initial medical history and physical examination.* Before commencing treatment that involves prescribing, administering or dispensing a controlled substance, an initial medical history shall be taken and an initial examination shall be conducted unless emergency circumstances justify otherwise. Alternatively, medical history and physical examination information recorded by another health care provider may be considered if the medical history was taken and the physical examination was conducted within the immediately preceding thirty days. The physical examination shall include an evaluation of the heart, lungs, blood pressure and body functions that relate to the patient's specific complaint.

b. *Reevaluations.* Among the factors to be considered in determining the number and the frequency of follow-up evaluations that should be recommended to the patient are the condition diagnosed, the controlled substance involved, expected results and possible side effects. For chronic conditions, periodic follow-up evaluations shall be recommended to monitor the effectiveness of the controlled substance in achieving the intended results.

c. *Patient counseling.* Appropriate counseling shall be given to the patient regarding the condition diagnosed and the controlled substance prescribed, administered or dispensed. Unless the patient is in an inpatient care setting, the patient shall be specifically counseled about dosage levels, instructions for use, frequency and duration of use and possible side effects.

d. *Medical Records.* Certain information shall be recorded in the patient's medical record on each occasion when a controlled substance is prescribed, administered or dispensed. This information shall include the name of the controlled substance, its strength, the quantity and the date it was prescribed, administered or dispensed to a patient. The medical record shall also include a specification of the symptoms observed and reported, the diagnosis of

the condition for which the controlled substance is being given and the directions given to the patient for the use of the controlled substance. If the same controlled substance continues to be prescribed, administered or dispensed, the medical record shall reflect changes in the symptoms observed and reported, in the diagnosis of the condition for which the controlled substance is being given and in the directions given to the patient.

### *Centers for Disease Control and Prevention ("CDC") Guidelines*

23.     According to CDC guidelines for prescribing opioids for chronic pain that were issued in March 2016, clinicians should use caution when prescribing opioids at any dosage, and should carefully reassess evidence of individual benefits and risks when considering increasing dosages to more than/equal 50 MME per day[2]. According to the CDC, clinicians should avoid increasing dosages to more than/equal to 90 MME per day or carefully justify a decision to titrate dosage to more than/equal to 90 MME per day.

24.     In the March 2016 guidelines, the CDC defined chronic pain as pain that typically lasts greater than three months or past the time of normal tissue healing. According to the CDC, patients with chronic pain should receive treatment that provides the greatest benefits relative to the risks. Although opioids can reduce pain during short-term use, clinical evidence found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy. While benefits for pain relief, function and quality of life with long-term opioid use for chronic pain are uncertain, risks associated with

---

[2] The CDC defines morphine milligram equivalents per day as the amount of morphine an opioid dose is equal to when prescribed, and in its "CDC Guideline for Prescribing Opioids for Chronic Pain" states the MME per day is often used as a gauge of the abuse and overdose potential of the amount of opioid that is being given at a particular time.

long-term opioid use are clearer and significant. Based on clinical evidence review, the CDC

states long-term opioid use for chronic pain is associated with serious risks including increased

risk for opioid use disorder, overdose, myocardial infarction, and motor vehicle injury.

## C. Relevant Individuals and Entities

25.     Neil K. Anand ("ANAND") is a medical doctor who holds himself out as a

provider for pain management and addiction medicine. ANAND operated a medical practice that

focused on pain management at three locations: 5000 Frankford Avenue, Suite 2, Philadelphia,

PA ("Location 1"); 5735 Ridge Avenue, Suite 101, Philadelphia, PA ("Location 2"); and 3554

Hulmeville Road, Suite 101, Bensalem, Pennsylvania ("Location 3") (collectively referred to as

the "PRACTICE").[3] ANAND graduated from Albany Medical College in 2001 and was issued

Pennsylvania medical license MD422681 on July 17, 2003. ANAND was subsequently assigned

DEA Registration Number BA8444565 for the purpose of prescribing controlled substances in

Schedules II through V. ANAND was also issued DEA Registration Number XA8444565 for the

---

[3] On September 10, 2019, a grand jury sitting in the Eastern District of Pennsylvania indicted
ANAND, Atif Mahmood Malik, Asif Khan Kundi, and Viktoriya Makarova on one count of
health care fraud, in violation of Title 18, United States Code, Section 1347, and one count of
conspiracy to distribute controlled substances, in violation of Title 21, United States Code,
Section 846. On September 25, 2019, ANAND and his three co-defendants were arrested and
federal search warrants were executed at ANAND's PRACTICE, ANAND's residence,
ANAND's vehicle, and ANAND's Post Office box. Additionally, on August 22, 2019, a search
warrant was executed at DrChrono, the electronic medical records software utilized by ANAND
at the PRACTICE.

purpose of prescribing buprenorphine products, including Suboxone, a Schedule III controlled substance, indicated for treatment of opioid dependence.[4]

26.     ANAND owns several non-pharmacy dispensing sites, which provide in-office dispensing of medications to patients at the office locations, including Anand Medical Investment ("AMI"), Institute of Advanced Medicine and Surgery ("IAMS"), and Bucks County Pain and Perioperative PLLC, doing business as Bucks County Spine and Pain Medicine ("BCSPM") (collectively referred to as the "DISPENSARIES"). Based on my review of Pennsylvania Department of State Records, TD Bank records, and Wells Fargo records, I am aware that ANAND is the owner and operator of the DISPENSARIES, the DISPENSARIES are currently active, and the DISPENSARIES are registered to 1313 Cheltenham Drive, Bensalem, Pennsylvania, which is ANAND's residence.

27.     ANAND and the DISPENSARIES participated in numerous federal and private insurance health care plans, including Medicare, health plans provided by OPM, OWCP, and IBC.

28.     Atif Mahmood Malik ("MALIK") is a foreign trained physician who received his medical degree from Ayub Medical College in Pakistan in January 2013. MALIK is not licensed

_____

[4] As of August 20, 2011, ANAND was authorized to administer, dispense, and prescribe buprenorphine products, including Suboxone, for the purpose of drug addiction treatment. Therefore, ANAND may qualify as a "program director" of a drug treatment center. Since the confidentiality of patient records at authorized drug treatment programs is highly regulated and subject to special restrictions and requirements as set forth in Titles 21 and 42 of the United States Code and the Code of Federal Regulations, on November 5, 2018 and June 7, 2019, the government obtained authorizations to use an undercover agent and/or confidential source and to obtain records from the PRACTICE.

to practice medicine in the United States. According to documents obtained from the Educational Commission for Foreign Medical Graduates ("ECFMG"), MALIK completed Step 1 of the process to become licensed to practice medicine in the United States.[5] MALIK worked for ANAND from 2017 through June 2019 at LOCATION 1 and LOCATION 2.

29.    Asif Khan Kundi ("KUNDI") is a foreign trained physician who received his medical degree from Ayub Medical College in Pakistan in September of 2012. KUNDI is not licensed to practice medicine in the United States. According to documents obtained from the ECFMG, KUNDI failed to show up for the first examination required for licensure in the United States. KUNDI worked for ANAND for approximately two years through summer 2019 and appears to manage the DISPENSARIES at LOCATION 1, LOCATION 2, and LOCATION 3.

30.    Viktoriya Makarova ("MAKAROVA") is a nurse practitioner ("NP") who graduated from the nurse practitioner program at Thomas Jefferson University in August 2017 and received board licensing in November 2017. MAKAROVA worked for ANAND from June 2018 through January 2019 at LOCATION 1 and LOCATION 2.

31.    Former Employee 1 is a foreign trained physician who received his medical degree from Katurba Medical College in India in March 2015. Former Employee 1 is not licensed to practice medicine in the United States. According to documents obtained from the

_____

[5] According to the ECFMG's website, an international medical graduate ("IMG") begins the certification process by first confirming that his/her medical school meets ECFMG requirements. Then, an IMG applies to the ECFMG for a USMLE/ECFMG Identification Number to use for the application and examination. To be certified by ECFMG, an IMG must meet examination and medical education credential requirements. These requirements include passing performance on medical science and clinical skills examinations—*United States Medical Licensing Examination* ("USMLE") Step 1, Step 2 Clinical Knowledge, and Step 2 Clinical Skills are the exams currently administered that satisfy these requirements—and primary-source verification of the IMG's medical education credentials, including the final medical diploma, final medical school transcript, and transcript(s) to document transferred academic credits (if applicable).

ECFMG, Former Employee 1 completed Steps 1 and 2 of the process to become licensed in the United States, passing Step 2 in July 2018. Between approximately July 2018 and November 2018, Former Employee 1 worked for ANAND an average of two days per week at LOCATION 1 and LOCATION 2.

32.     Former Employee 2 worked for ANAND between approximately February 2016 and May 2017. Former Employee 2 was hired to run ANAND's DISPENSARIES.

## IV.   MDSCRIPTS

33.     MDScripts provides a web-based system for in-office dispensaries. According to its website at www.mdscripts.com, MDScripts is, "trusted by over 17,000 physician offices nationwide, and is the largest in-office dispensing platform in the industry. With hundreds of customization options, the platform can be configured to work in a clinical setting, regardless of staffing or specialty." MDScripts provides a range of services through its sites, including MDPatient, MDScripts, and/or RxBilling. MDScripts stores all information on a live server for five years at which time the information is then archived on a second server.

34.     On January 10 and 13, 2020, MDScripts disclosed that since approximately 2015, ANAND utilized several sites within the MDScripts system, including under the names of IAMS and AMI. MDScripts further disclosed that the sites contain user data, patient data, billing/insurance data, dispensed medication data, prescriber data, and inventory data. According to MDScripts, the date of the last login to sites utilized by ANAND was January 12, 2020.

35.     In my experience investigating health care fraud, I have learned that EHR document both services purportedly provided and the purported conditions of patients who received services. Such information can be important evidence when attempting to determine whether claims submitted to Medicare, OPM, OWCP, and IBC for services purportedly provided

by a physician were actually provided and medically necessary, and whether the physician billing Medicare, OPM, OWCP, and IBC actually rendered these services. Administrative logs within the electronic medical record system also indicate whether records were altered to hide fraudulent activities.

36. In general, providers like MDScripts ask each of their subscribers to provide certain personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, e-mail addresses, and, for paying subscribers, a means and source of payment (including any credit or bank account number). Providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account. In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP address associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

37. In some cases, account users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

V.    **PROBABLE CAUSE**

38.    Based upon my review of: (1) interviews of former employees and patients; (2) recordings made by a Patient; (3) claims data; and (4) Pennsylvania Prescription Drug Monitoring Program ("PDMP") data,[6] there is probable cause to believe that ANAND, together with others, submitted or caused the submission of false and fraudulent claims to Medicare, OPM, OWCP, and IBC for the provision of medically unnecessary prescription medications. Further, there is probable cause to believe that ANAND, together with others, knowingly and intentionally distributed a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose.

39.    As a medical doctor, ANAND was authorized to prescribe medications to patients, including controlled substances, for legitimate medical purposes and in the usual course of professional practice. As the owner of non-pharmacy dispensing sites, ANAND could dispense prescription drugs from the PRACTICE and submit claims to insurance programs for those prescription drugs. The investigation revealed that ANAND operated a scheme in which ANAND prescribed medically unnecessary prescription medications to patients at the PRACTICE that were dispensed and billed by the DISPENSARIES to Medicare, OPM, and IBC.[7] As a matter of course, patients automatically received a bag of medications at each visit to the PRACTICE, which contained numerous medically unnecessary prescription medications,

---

[6] The Pennsylvania Prescription Drug Monitoring Program ("PDMP") is a statewide computer program,which collects information regarding prescriptions of controlled substances submitted by pharmacies and dispensing practitioners. These programs assist in the detection of patients and clinicians who are diverting controlled substances.

[7] The Dispensaries did not submit claims to OWCP because the Dispensaries were not enrolled with OWCP.

including Lidocaine[8], Vanatol LQ/S[9], Temazepam[10], Allzital[11], Metaxalone[12], Diclofenac

Sodium Gel[13], Celecoxib[14], Nalfon[15], and Omeprazole[16], among others. The bags of medications

were referred to as "Goody Bags" by patients and staff at the PRACTICE. To carry out his

scheme, ANAND not only dispensed unnecessary medications to patients under his care, but

surreptitiously recruited them as unknowing participants in his scheme because they had to

accept the Goody Bag in order to receive a prescription for a controlled substance and falsely

sign a tablet acknowledging payment of a co-pay for the Goody Bag. The investigation revealed

[8] Lidocaine is an anesthetic and antiarrhythmic that can treat irregular heartbeats (arrhythmias). It can also relieve pain and numb the skin.

[9] Vanatol is an analgesic that can treat headaches. Vanatol can cause paranoid or suicidal ideation and impair memory, judgment, and coordination. Combining with other substances, particularly alcohol, can slow breathing and possibly lead to death.

[10] Temazepam, a Schedule IV controlled substance, is a sedative that can treat insomnia. It can cause paranoid or suicidal ideation and impair memory, judgment, and coordination. Combining with other substances, particularly alcohol, can slow breathing and possibly lead to death.

[11] Allzital is a sedative and analgesic that can treat tension headaches. It can cause paranoid or suicidal ideation and impair memory, judgment, and coordination. Combining with other substances, particularly alcohol, can slow breathing and possibly lead to death.

[12] Metaxalone is a muscle relaxant that can relax certain muscles. It can also relieve pain caused by injuries, sprains, and strains.

[13] Diclofenac Sodium Gel is a nonsteroidal anti-inflammatory drug that can treat pain, migraines, and arthritis in its oral form. It can also treat actinic keratoses in its topical form.

[14] Celecoxib is a nonsteroidal anti-inflammatory drug that is used to treat pain and inflammation associated with arthritis and ankylosing spondylitis, and acute pain.

[15] Nalfon is a nonsteroidal anti-inflammatory drug used to treat mild to moderate pain, and helps to relieve symptoms of arthritis (osteoarthritis and rheumatoid arthritis), such as inflammation, swelling, stiffness, and joint pain.

[16] Omeprazole is a proton-pump inhibitor that can treat heartburn, a damaged esophagus, stomach ulcers, and gastroesophageal reflux disease.

that patients did not want or need the goody bags, that patients were not told what medications were in the goody bag or how the medications should be used, and that patients were told to toss or give away unused Goody Bags.

40.    In order to facilitate his scheme and maximize the number of patients seen at the PRACTICE, ANAND employed foreign medical school graduates who were not licensed to practice medicine in the United States, including MALIK, KUNDI and Former Employee 1, among others (collectively referred to as "FOREIGN GRADUATES"). The FOREIGN GRADUATES presented themselves as doctors to unsuspecting patients and were the primary providers of medical services purportedly provided at the PRACTICE.  The investigation revealed that patients believed that the FOREIGN GRADUATES were licensed physicians because they introduced themselves as doctors and patients and staff referred to them as doctors. Generally, patients were seen by the FOREIGN GRADUATES who provided medical advice to patients and prescribed controlled substances to patients.  The FOREIGN GRADUATES filled in the details of the prescription, including drug information and dosage, on prescriptions that were either pre-signed by ANAND or a licensed professional, such as MAKAROVA or ANAND, would briefly enter the examination room to sign a number of blank prescriptions. Further, when a patient with certain insurance coverage, including Medicare and IBC, arrived at the PRACTICE, Former Employee 2, KUNDI, and others identified what medications the patient's insurance would cover and prepared a bag of medications for the patient, the Goody Bag. The medications in the Goody Bag were pre-determined based on insurance coverage, not the medical needs of a particular patient.

41.    I and other law enforcement officers have interviewed former employees and patients seen at the PRACTICE.

### *Former Employee 1*

42.     On or about July 16, 2019 and July 30, 2019, law enforcement interviewed Former Employee 1 who worked for ANAND from July 2018 to November 2018. ANAND described the duties of Former Employee 1 as medical intern or junior scribe, defined by ANAND as someone who is learning the language of prescriptions and would write prescriptions under ANAND's guidance with ANAND signing off on the prescriptions. Former Employee 1 worked between two to four days a week primarily at LOCATION 1 and LOCATION 2. ANAND employed four other foreign medical school graduates in addition to Former Employee 1, including MALIK and KUNDI.

43.     Former Employee 1 stated that patients were seen by the FOREIGN GRADUATES and that ANAND or MAKAROVA merely signed prescriptions prepared by the FOREIGN GRADUATES or ANAND left blank prescriptions for the FOREIGN GRADUATES. Former Employee 1 stated that there was a system in place at the PRACTICE that patients had to take the Goody Bags at every visit and receive injections at every second or third visit, otherwise patients may not receive prescriptions for controlled substances. KUNDI was responsible for preparing the Goody Bags and the Goody Bags contained whatever medications were covered by a particular patient's insurance. KUNDI brought the Goody Bag to the exam room and had patients sign a tablet upon receipt of the Goody Bag.

-------

### *Makarova*

44.     On or about July 8, 2019 and July 16, 2019, law enforcement interviewed MAKAROVA who worked for ANAND as a NP from June 2018 to January 2019. ANAND described the duties of MAKAROVA as visiting with patients, prescribing medications, and

assisting with injections. MAKAROVA generally worked Mondays and Tuesdays at Location 1 or Location 2. MAKAROVA did not see ANAND often on those days. MAKAROVA was trained on how to document patient visits in DrChrono.

45.    MAKAROVA stated that KUNDI handled the DISPENSARIES and that each patient received a bag of pre-set medications. MAKAROVA stated that every time a patient came to the office, KUNDI looked up what medications the patient was receiving from the DISPENSARIES and brought a Goody Bag to the exam room, at which time the patient signed a tablet. MAKAROVA heard patients state that they did not need the medications and were told by KUNDI or MALIK to take the medication and use it later or give it to someone else. MAKAROVA heard ANAND tell patients that they would not get their Oxycodone prescription if they did not receive an injection. Former Employee 2 believes that same principle applied with the Goody Bags filled at the DISPENSARIES.

46.    MAKAROVA stated that the FOREIGN GRADUATES saw the patients and told MAKAROVA what prescriptions a patient needed at which time MAKAROVA signed the requested number of blank prescriptions and handed it to the FOREIGN GRADUATES who filled in drug and patient information. On average, each patient received between two and three prescriptions.

47.    MAKAROVA stated that ANAND, office staff and patients referred to FOREIGN GRADUATES as physicians. ANAND left pre-signed prescription pads in a cabinet for the FOREIGN GRADUATES to use.

### *Former Employee 2*

48.     On or about November 26, 2019 and December 26, 2019, law enforcement interviewed Former Employee 2 who worked for ANAND from February 2016 to May 2017. Former Employee 2 was hired to run ANAND's DISPENSARIES.

49.     Former Employee 2 stated that ANAND was involved in the DISPENSARIES and used the MDScripts software to operate the DISPENSARIES. Former Employee 2, along with others, ran test claims using MDScripts before a patient's visit to determine what medications were reimbursable and shared the results with ANAND.

50.     Former Employee 2 stated that ANAND told Former Employee 2 that ANAND was always looking for higher profit. ANAND's policy was to determine what medications a patient's insurance covered and then to prescribe the most expensive medication. ANAND required an explanation from Former Employee 2 when a patient did not receive a medication that insurance covered. According to Former Employee 2, approximately ninety percent of ANAND's patients received the same medications because the insurance plans covered similar medications.

51.     Former Employee 2 stated that patients were given a Goody Bag at office visits. Former Employee 2 further stated that patients had to accept the Goody Bag in order to get their opioid prescriptions. The Goody Bags were used to give the appearance that the office was treating patients with more than just opioids.

52.     Former Employee 2 stated that the prescriptions for Goody Bags were automatically generated by MDScripts and the printed prescriptions were signed by ANAND and others at the end of the day.

53.     Former Employee 2 recalled that ANAND signed numerous back-dated prescriptions from the DISPENSARIES in order to pass an audit.

### Patient 1

54.     On or about June 3, 2019, law enforcement agents interviewed Patient 1, whose identity is known to me. Patient 1 began seeing ANAND in approximately January 2015 for knee and lower back pain. Initially, Patient 1 paid approximately $400 cash for treatment because ANAND did not accept Patient's 1 health insurance.  In 2016, Patient 1 enrolled in Medicare and Medicaid, at which time ANAND began giving Patient 1 injections and a bag of medications that Patient 1 did not need or want.

55.     Based on my review of Medicare claims data, I am aware that on 35 dates between February 26, 2016 and April 4, 2019, ANAND prescribed approximately 128 Goody Bag medications to Patient 1 for which he was paid approximately $66,770. Below are a sample of dates on which ANAND prescribed Goody Bags for Patient 1.

| Approximate Date Prescription Written | Medication Prescribed | Billing Provider | Paid Amount |
|---|---|---|---|
| November 1, 2017 | Vanatol S | AMI | $3,207.93 |
| November 1, 2017 | Diclofenac Sodium | AMI | $201.17 |
| November 1, 2017 | Temazepam | AMI | $125.58 |
| November 1, 2017 | Lidocaine | AMI | $32.82 |
| November 1, 2017 | Cyclobenzaprine Hydrochlo | AMI | $343.38 |
| November 1, 2017 | Fenoprofen Calcium | AMI | $281.85 |
| November 29, 2017 | Naproxen Sodium CR | AMI | $1,036.59 |
| November 29, 2017 | Diclofenac Sodium | AMI | $195.50 |
| November 29, 2017 | Temazepam | AMI | $110.35 |
| November 29, 2017 | Lidocaine | AMI | $167.35 |
| November 29, 2017 | Cyclobenzaprine Hydrochlo | AMI | $345.32 |
| November 29, 2017 | Nalfon | AMI | $406.94 |
| January 17, 2018 | Naproxen Sodium CR | AMI | $813.81 |
| January 17, 2018 | Diclofenac Sodium | AMI | $279.46 |
| January 17, 2018 | Vanatol LQ | AMI | $3,508.00 |
| January 17, 2018 | Temazepam | AMI | $143.96 |

| Approximate Date Prescription Written | Medication Prescribed | Billing Provider | Paid Amount |
|---|---|---|---|
| January 17, 2018 | Omeprazole/Sodium Bicarbo | AMI | $2,359.81 |
| January 17, 2018 | Cyclobenzaprine Hydrochlo | AMI | $411.74 |
| June 5, 2018 | Omeprazole/Sodium Bicarbo | AMI | $1,106.12 |
| June 5, 2018 | Allzital | AMI | $1,197.94 |
| June 5, 2018 | Naproxen Sodium CR | AMI | $1,614.50 |
| June 5, 2018 | Diclofenac Sodium | AMI | $270.50 |
| June 5, 2018 | Diclofenac Sodium | AMI | $386.83 |
| June 5, 2018 | Vanatol LQ | AMI | $1,162.50 |
| June 5, 2018 | Temazepam | AMI | $157.71 |
| June 5, 2018 | Lidocaine | AMI | $1,013.38 |
| June 5, 2018 | Cyclobenzaprine Hydrochlo | AMI | $462.08 |
| June 5, 2018 | Nalfon | AMI | $408.99 |

56.     Based on my review of PDMP data, I am aware that on 31 dates between January 28, 2016 and June 20, 2019, Patient 1 received approximately 31 prescriptions for controlled substances from ANAND. Below are a sample of dates on which ANAND prescribed controlled substances to Patient 1.

| Approximate Date Prescription Written | Prescribed Schedule II Controlled Substance | Quantity | Days of Supply | MME/Per Day |
|---|---|---|---|---|
| September 6, 2017 | Fentanyl 100 mcg/hr patch | 10 | 30 | 240.0 MME |
| September 6, 2017 | Methadone hcl 10 mg tablet | 360 | 30 | 360.0 MME |
| November 29, 2017 | Methadone hcl 10 mg tablet | 360 | 30 | 360.0 MME |
| November 29, 2017 | Fentanyl 100 mcg/hr patch | 10 | 30 | 240.0 MME |
| January 24, 2018 | Methadone hcl 10 mg tablet | 360 | 30 | 360.0 MME |
| January 24, 2018 | Fentanyl 100 mcg/hr patch | 10 | 30 | 240.0 MME |

**Patient 2**

57.     On or about May 9, 2019, law enforcement agents interviewed Patient 2, whose identity is known to me. Patient 2 stated that Patient 2 had IBC insurance and was a patient of ANAND's for two years for back and shoulder pain. Patient 2 first visited Location 1 and Patient 2 received prescriptions for Percocet from ANAND which Patient 2 filled at a local pharmacy. At every appointment, Patient 2 received a bag of medications, including Lidocaine cream, among other medications. Upon receipt of the bag of medications, Patient 2 was instructed to sign a tablet indicating that Patient 2 paid a co-pay for the medications though Patient 2 never paid a copay. Patient 2 was never asked if she wanted or needed the bag of medications.

58.     Based on my review of IBC claims data, I am aware that on 7 dates between June 13, 2018 and December 4, 2018, ANAND prescribed approximately 61 Goody Bag medications to Patient 2 for which he was paid approximately $47,711. Below are a sample of dates on which ANAND prescribed Goody Bags for Patient 2.

| Approximate Date Prescription Written | Medication Prescribed | Billing Provider | Paid Amount |
|---|---|---|---|
| June 13, 2018 | Cyclobenzaprine HCL | AMI | $453.02 |
| June 13, 2018 | Diclofenac Sodium | AMI | $814.35 |
| June 13, 2018 | Lidocaine | AMI | $98.27 |
| June 13, 2018 | Lidocaine | AMI | $562.56 |
| June 13, 2018 | Mebolic | AMI | $821.19 |
| June 13, 2018 | Nalfon | AMI | $298.58 |
| June 13, 2018 | Naproxen Sodium CR | AMI | $1,507.65 |
| June 13, 2018 | Omeprazole/Sodium Bicarbo | AMI | $468.10 |
| June 13, 2018 | Temazepam | AMI | $132.98 |
| June 13, 2018 | Vanatol LQ | AMI | $1,051.25 |
| September 11, 2018 | Cyclobenzaprine HCL | AMI | $409.01 |
| September 11, 2018 | Diclofenac Sodium | AMI | $778.65 |
| September 11, 2018 | Eszopiclone | AMI | $136.73 |

| Approximate Date Prescription Written | Medication Prescribed | Billing Provider | Paid Amount |
|---|---|---|---|
| September 11, 2018 | Lidocaine | AMI | $576.52 |
| September 11, 2018 | Nalfon | AMI | $298.58 |
| September 11, 2018 | Naproxen Sodium CR | AMI | $1,541.90 |
| September 11, 2018 | Omeprazole/Sodium Bicarbo | AMI | $486.06 |
| September 11, 2018 | Tramadol HCL ER | AMI | $209.83 |
| September 11, 2018 | Vanatol LQ | AMI | $1,166.75 |
| September 11, 2018 | Xyzbac | AMI | $1,822.28 |

59.     Based on my review of PDMP data, I am aware that on 13 dates between June 13, 2018 and June 11, 2019, Patient 2 received approximately 13 prescriptions for controlled substances from ANAND or Former Employees. Below are a sample of dates on which ANAND or Former Employees prescribed controlled substances to Patient 2.

| Approximate Date Prescription Written | Prescribed Schedule II Controlled Substance | Quantity | Days of Supply | MME/Per Day |
|---|---|---|---|---|
| June 13, 2018 | Oxycodone HCL 10 mg tablet | 120 | 20 | 90.0 MME |
| September 11, 2018 | Oxycodone HCL 10 mg tablet | 120 | 30 | 60.0 MME |

### *Patient 3*

60.     On or about May 8, 2019, law enforcement agents interviewed Patient 3, whose identity is known to me. Patient 3 stated that Patient 3 had IBC insurance and became a patient of ANAND's on or about May 2017 for lower back pain. Patient 3 initially sought treatment at Location 1. Beginning with the first office visit and at each subsequent appointment, Patient 3 was given a bag of medications, consisting of creams and pills such as Lidocaine and Temazepam, among other medications, but no one ever told Patient 3 what medications were in the bag or how the medications should be used. Upon receiving the bag of medications, Patient

3 was instructed to sign a tablet indicating that Patient 3 paid a copay for the bag of medications, though Patient 3 did not actually pay a copay. Patient 3 sometimes used the Lidocaine, but the other medications just accumulated and got thrown away. Patient 3 stated patients and office staff referred to the bag of medications dispensed by ANAND as Goody Bags.

61. Based on my review of IBC claims data, I am aware that on 17 dates between January 20, 2016 and February 13, 2019, ANAND prescribed approximately 59 Goody Bag medications to Patient 3 for which he was paid approximately $22,955. Below are a sample of dates on which ANAND prescribed Goody Bags for Patient 3.

| Approximate Date Prescription Written | Medication Prescribed | Billing Provider | Paid Amount |
|---|---|---|---|
| April 13, 2016 | Duloxetine HCL | BCSPM | $350.33 |
| April 13, 2016 | Cyclobenzaprine HCL | BCSPM | $480.83 |
| April 13, 2016 | Diclofenac Sodium | BCSPM | $388.05 |
| April 13, 2016 | Lidocaine | BCSPM | $120.04 |
| May 9, 2018 | Indomethacin ER | AMI | $70.45 |
| May 9, 2018 | Eszopiclone | AMI | $503.56 |
| May 9, 2018 | Vanatol LQ | AMI | $1,047.50 |
| May 9, 2018 | Lidocaine | AMI | $558.81 |
| May 9, 2018 | Cyclobenzaprine HCL | AMI | $449.27 |
| June 13, 2018 | Indomethacin ER | AMI | $70.45 |
| June 13, 2018 | Eszopiclone | AMI | $503.56 |
| June 13, 2018 | Vanatol LQ | AMI | $1,047.50 |
| June 13, 2018 | Cyclobenzaprine HCL | AMI | $449.27 |

62. Based on my review of IBC claims data, I am aware that on 22 dates between January 20, 2016 and August 16, 2018, Patient 3 received approximately 22 prescriptions for Schedule III controlled substances from ANAND. Below are a sample of dates on which ANAND prescribed controlled substances to Patient 3.

| Approximate Date Prescription Written | Prescribed Schedule III Controlled Substance | Quantity | Days of Supply |
|---|---|---|---|
| April 18, 2016 | Suboxone | 60 | 30 |
| May 9, 2018 | Suboxone | 60 | 60 |
| June 14, 2018 | Suboxone | 30 | 30 |

### *Patient 4*

63.     On or about May 22, 2019, law enforcement agents interviewed Patient 4, whose identity is known to me. Patient 4 stated that Patient 4 is enrolled in Medicare and had been a patient of ANAND's for approximately three years for back pain. Patient 4 stated that Patient 4 received prescriptions for Oxycodone and Tramadol from ANAND that Patient 4 filled at a local pharmacy and that Patient 4 was given a bag of medications at every appointment that contained Lidocaine Cream, Diclofenac Sodium Gel, and Temazepam, among other medications. Patient 4 signed a tablet indicating that Patient 4 paid a copay for the bag of medications, though Patient 4 was only asked to pay a copay about four or five times. At no time did ANAND, or any staff member, explain to Patient 4 what the medications were, how to use the medications, and why the medications were needed. Patient 4 thought the bag of medications was shady and that ANAND prescribed the bag of medications to make money. Patient 4 could not refuse to accept the bag of medications because then Patient 4 would not get the prescriptions for the medications Patient 4 really needed. Patient 4 discarded most of the medications dispensed by ANAND.

64.     Patient 4 stated that Patient 4 left ANAND's practice and obtained Patient 4's medical records upon leaving ANAND's practice.[17]  Based on my review of Patient 4's medical records, I am aware that the medical records contained entries from DrChrono with notes for

---

[17] Based on my review of Patient 4's Medicare prescription drug claims, Patient 4 left ANAND's practice in approximately March 2019.

office visits on September 9, 2018 and July 23, 2018 indicating that Former Employee 2 was Patient 4's medical provider on these dates. Patient 4 stated that Patient 4 had never been treated by Former Employee 2.

65. Based on my review of Medicare claims data, I am aware that on 34 dates between April 27, 2016 and February 5, 2019, ANAND prescribed approximately 95 Goody Bag medications to Patient 4 for which he was paid approximately $41,515. Below are a sample of dates on which ANAND prescribed Goody Bags for Patient 4.

| Approximate Date Prescription Written | Medication Prescribed | Billing Provider | Paid Amount |
|---|---|---|---|
| November 1, 2017 | Diclofenac Sodium | AMI | $287.27 |
| November 1, 2017 | Temazepam | AMI | $160.08 |
| November 1, 2017 | Lidocaine | AMI | $107.64 |
| November 1, 2017 | Omeprazole-Sodium | AMI | $1,877.65 |
| November 1, 2017 | Cyclobenzaprine HCL | AMI | $394.52 |
| November 29, 2017 | Naproxen Sodium CR | AMI | $1,184.10 |
| November 29, 2017 | Diclofenac Sodium | AMI | $287.27 |
| November 29, 2017 | Temazepam | AMI | $165.20 |
| November 29, 2017 | Fluocinonide | AMI | $1,091.91 |
| November 29, 2017 | Lidocaine | AMI | $115.13 |
| November 29, 2017 | Omeprazole-Sodium | AMI | $1,877.65 |

66. Based on my review of PDMP data, I am aware that on 33 dates between March 31, 2016 and February 5, 2019, Patient 4 received approximately 65 prescriptions for controlled substances from ANAND or Former Employee 2. Below are a sample of dates on which ANAND or Former Employee 2 prescribed controlled substances to Patient 4.

| Approximate Date Prescription Written | Prescribed Schedule II Controlled Substance | Quantity | Days of Supply | MME/Per Day |
|---|---|---|---|---|
| November 1, 2017 | Oxycodone hcl 30 mg tablet | 120 | 20 | 270.0 MME |

| November 1, 2017 | Morphine sulf er 200 mg tablet | 60 | 30 | 400.0 MME |
| December 19, 2017 | Morphine sulf er 200 mg tablet | 60 | 30 | 400.0 MME |
| December 19, 2017 | Oxycodone hcl 30 mg tablet | 120 | 20 | 270.0 MME |

*Patient 5*

67. On or about June 3, 2019, law enforcement agents interviewed Patient 5, whose identity is known to me. Patient 5 stated that Patient 5 was enrolled into Medicare and had been a patient of ANAND's for approximately three years for neck, back, and shoulder pain. Patient 5 stopped seeking medical care from the PRACTICE in April 2019. ANAND prescribed Oxycodone and other medications to Patient 5 that Patient 5 filled at a local pharmacy. In 2016, Patient 5 started receiving bags of medications from ANAND's DISPENSARIES, which included Lidocaine, Vanatol, and Temazepam, among other medications. KUNDI usually gave Patient 5 the bag of medication and instructed Patient 5 to sign a tablet indicating that Patient 5 paid a copay for the bag of medications, though Patient 5 did not actually pay a copay. At no time did ANAND, or any staff member, explain to Patient 5 what the medications were, how to use the medications, or why the medications were needed.

68. Patient 5 further stated that on at least two occasions Patient 5 informed ANAND that Patient 5 did not want the bag of medications and ANAND told Patient 5 that if Patient 5 did not accept the dispensed medications, Patient 5 would not receive a prescription for Oxycodone. Patient 5 usually discarded the bag of medications. Patient 5 provided law enforcement with two unopened bottles of Metaxalon (800mg/100 tablets), one unopened bottle of Temazepam (22.5mg/30tablets), one unopened bottle of Celecoxib (200mg/60 tablets), two unopened bottles of Nalfon (400mg), six unopened tubes of Diclofenac Sodium, and nine unopened tubes of Lidocaine Cream. All the medications were labeled Institute of Advanced Medicine and Surgery,

Dr. Neil Anand, MD, 5735 Ridge Avenue, Philadelphia, PA 19128.

69.     ANAND told Patient 5 to use different insurance providers every month for his

prescriptions, which included Express Scripts and Envision. ANAND instructed Patient 5 to

write a letter, falsely indicating that Patient 5 wanted, needed, and utilized the medications

dispensed by ANAND's office that ANAND would submit to Patient 5's insurance provider.

ANAND informed Patient 5 that if Patient 5 did not provide this letter, Patient 5 would not

receive prescriptions for Oxycodone.

70.     Based on my review of Medicare claims data, I am aware that on 36 dates

between November 23, 2015 and April 1, 2019, ANAND prescribed approximately 139 Goody

Bag medications to Patient 5 for which he was paid approximately $69,938. Below are a sample

of dates on which ANAND prescribed Goody Bags for Patient 5.

| Approximate Date Prescription Written | Medication Prescribed | Billing Provider | Paid Amount |
|---|---|---|---|
| July 28, 2017 | Lidocaine | IAMS | $200.25 |
| July 28, 2017 | Allzital | IAMS | $1,205.66 |
| July 28, 2017 | Naproxen Sodium CR | IAMS | $1,036.59 |
| July 28, 2017 | Diclofenac Sodium | IAMS | $340.17 |
| July 28, 2017 | Vanatol LQ | IAMS | $1,170.00 |
| July 28, 2017 | Temazepam | IAMS | $106.09 |
| July 28, 2017 | Omeprazole/Sodium | IAMS | $467.49 |
| July 28, 2017 | Cyclobenzaprine | IAMS | $344.52 |
| July 28, 2017 | Nalfon | IAMS | $406.94 |
| October 20, 2017 | Vanatol S | IAMS | $3,207.93 |
| October 20, 2017 | Lidocaine | IAMS | $191.93 |
| October 20, 2017 | Omeprazole/Sodium | IAMS | $360.38 |
| October 20, 2017 | Cyclobenzaprine | IAMS | $343.01 |
| October 20, 2017 | Fenoprofen Calcium | IAMS | $288.48 |
| November 13, 2017 | Vanatol S | IAMS | $3,207.93 |
| November 13, 2017 | Lidocaine | IAMS | $173.58 |
| November 13, 2017 | Omeprazole/Sodium | IAMS | $358.18 |
| November 13, 2017 | Cyclobenzaprine | IAMS | $345.44 |
| November 13, 2017 | Nalfon | IAMS | $406.94 |

71.    Based on my review of PDMP data, I am aware that on 43 dates between November 23, 2015 and April 29, 2019, Patient 5 received approximately 83 prescriptions for controlled substances from ANAND or Former Employee 2. Below are a sample of dates on which ANAND or Former Employee 2 prescribed controlled substances to Patient 5.

| Approximate Date Prescription Written | Prescribed Schedule II Controlled Substance | Quantity | Days of Supply | MME/Per Day |
|---|---|---|---|---|
| July 28, 2017 | Fentanyl 100 mcg/hr patch | 10 | 30 | 240.0 MME |
| July 28, 2017 | Oxycodone hcl 30 mg tablet | 120 | 30 | 180.0 MME |
| October 20, 2017 | Fentanyl 100 mcg/hr patch | 10 | 30 | 240.0 MME |
| October 20, 2017 | Oxycodone hcl 30 mg tablet | 120 | 20 | 270.0 MME |
| November 13, 2017 | Fentanyl 100 mcg/hr patch | 10 | 30 | 240.0 MME |
| November 13, 2017 | Oxycodone hcl 30 mg tablet | 120 | 20 | 270.0 MME |

### Patient 6

72.    On or about June 6, 2019, law enforcement agents interviewed Patient 6. Patient 6 has been seeing ANAND for pain management for approximately six or seven years. Patient 6 sees ANAND for a work-related injury sustained in 2004 while employed at the School District of Philadelphia. Patient 6 stated that all services provided by ANAND and medications prescribed by ANAND should have been billed to the School District of Philadelphia worker's compensation program. Patient 6 enrolled in Medicare in about 2003.

73.    According to Patient 6, Patient 6 receives paper prescriptions from ANAND for Percocet 30mg and OxyContin 40mg and that ANAND also prescribes Lidocaine cream, a sleep

medication, and muscle relaxers, which are dispensed out of ANAND's in-house pharmacy. Patient 6 told ANAND that all services provided by ANAND and medications prescribed by ANAND should be billed to the School District of Philadelphia worker's compensation program. Patient 6 stated the medications from ANAND's in-house pharmacy were automatically dispensed.

74. Based on my review of Medicare claims data, I am aware that on 27 dates between September 26, 2016 and May 21, 2019, ANAND prescribed approximately 80 Goody Bag medications to Patient 6 for which he was paid approximately $39,495. Below are a sample of dates on which ANAND prescribed Goody Bags for Patient 6.

| Approximate Date Prescription Written | Medication Prescribed | Billing Provider | Paid Amount |
|---|---|---|---|
| October 24, 2016 | Diclofenac Sodium | IAMS | $822.47 |
| October 24, 2016 | Temazepam | IAMS | $536.12 |
| October 24, 2016 | Lidocaine | IAMS | $2,353.62 |
| October 24, 2016 | Cyclobenzaprine | IAMS | $857.52 |
| July 18, 2017 | Calcipotriene | AMI | $332.05 |
| July 18, 2017 | Naproxen Sodium CR | AMI | $1,184.10 |
| July 18, 2017 | Temazepam | AMI | $160.08 |
| July 18, 2017 | Omeprazole/Sodium | AMI | $1,877.65 |
| August 1, 2017 | Fluocinonide | AMI | $908.92 |
| August 1, 2017 | Cyclobenzaprine | AMI | $320.63 |
| August 15, 2017 | Calcipotriene | AMI | $332.05 |
| August 15, 2017 | Naproxen Sodium CR | AMI | $1,184.10 |
| August 15, 2017 | Omeprazole/Sodium | AMI | $1,877.65 |

75. Based on my review of PDMP data, I am aware that on 42 dates between December 24, 2015 and July 17, 2019, Patient 6 received approximately 84 prescriptions for controlled substances from ANAND or Former Employee 2. Below are a sample of dates on which ANAND or Former Employee 2 prescribed controlled substances to Patient 6.

| Approximate Date Prescription Written | Prescribed Schedule II Controlled Substance | Quantity | Days of Supply | MME/Per Day |
|---|---|---|---|---|
| July 18, 2017 | Oxycodone HCL ER 40 mg tablet | 60 | 30 | 120.0 MME |
| July 18, 2017 | Oxycodone HCL 20 mg tablet | 120 | 20 | 180.0 MME |
| August 15, 2017 | Oxycodone HCL 20 mg tablet | 120 | 20 | 180.0 MME |
| August 15, 2017 | Oxycodone HCL ER 40 mg tablet | 60 | 30 | 120.0 MME |

### *Patient 7*

76.     On or about October 25, 2018, law enforcement agents interviewed Patient 7,

whose identity is known to me. Patient 7 stated that Patient 7 had been a patient of ANAND's for

over three years and was treated at LOCATION 1 and LOCATION 2 for lower back pain

resulting from a motor vehicle accident. ANAND prescribes several medications for Patient 7,

including oxycodone. On about August 2018, Patient 7 enrolled in IBC at which time ANAND

began giving Patient 7 a bag of medications at each office visit, that included Lidocaine Cream,

Vanatol, Temazepam, Allzital, Metaxalone, and Diclofenac Sodium Gel. KUNDI was usually

the person who handed Patient 7 the bag of medications. At one visit, Patient 7 tried to reject the

bag of medications and was told by office staff that Patient 7 should just take the bag because the

insurance company covered the cost of medications. At no time did ANAND, or any staff

member, explain to Patient 7 what the medications were, how to use the medications, and why

the medications were needed. Patient 7 never paid a copay for the medications. Patient 7 gave

agents unused medications, including three unopened bottles of Allzital (25mg/100 tablets), two

unopened bottle of Metaxalone (800mg/100 tablets), and one unopened tube of Diclofenac

Sodium Gel. All the medications were labeled AMI Pharmacy, Neil Anand MD, 5000 Frankford

Avenue, Philadelphia, PA 19124.

77.     On or about November 6, 2018, at the direction of law enforcement, Patient 7 recorded Patient 7's appointment at LOCATION 1. Based upon my review of the recording, I am aware that Patient 7 was seen by Former Employee 1 and that during the office visit, KUNDI and Former Employee 2 entered the exam room. KUNDI handed Patient 7 a plastic bag and referred to it as a Goody Bag. Patient 7 stated that Patient 7 was overstocked on the medications and KUNDI replied that Patient 7 should take the Goody Bag because the insurance was already run and ANAND would be mad if Patient 7 did not take the bag. Former Employee 1 told Patient 7 to donate the medications that Patient 7 does not need. KUNDI instructed Patient 7 to sign a tablet. Former Employee 1 told MAKAROVA that he needed two prescriptions; MAKAROVA gave Former Employee 1 two pre-signed blank prescriptions that Former Employee 1 filled out for Oxycodone and provided the prescriptions to Patient 7. Patient 7 gave the Goody Bag to law enforcement. Based upon my review of the contents of the goody bag, I am aware that the Goody Bag contained numerous prescription medications that were dispensed by AMI including Metaxalone, Omeprazole/Sodium Bicarbonate, Allzital, Vanatol, and Temazepam.

78.     On or about December 4, 2018, at the direction of law enforcement, Patient 7 recorded Patient 7's appointment at LOCATION 1. Based upon my review of the recording, I am aware that Patient 7 was seen by MALIK. During the appointment, MALIK exited the exam room and KUNDI entered the exam room and handed a Goody Bag to Patient 7 that contained Vanatol, Diclofenac Sodium, Allzital, and Metaxalone dispensed by AMI. Patient 7 told KUNDI that Patient 7 did not need the medications, to which KUNDI replied that he will stop giving them to Patient 7 next time until Patient 7 finishes the medications. KUNDI instructed Patient 7 to sign a tablet to document the payment of a copay, but Patient 7 did not actually pay a copay.

MALIK returned to the exam room and wanted to give Patient 7 an injection. Patient 7 resisted the injection and MALIK ultimately stated that Patient 7 would have to get the injection next time otherwise it would be a problem with authorization for the medications. MAKAROVA entered the room and asks about the injections. MALIK explains how they have to give injections, therapy and medications. MALIK told MAKAROVA that he needed four prescriptions, MAKAROVA handed MALIK four pre-signed blank prescriptions and MALIK filled in the prescriptions, including one for Oxycodone, and gave them to Patient 7.

79.     Based on my review of the PDMP data, below is a summary of prescriptions for Schedule II controlled substances that ANAND or MAKAROVA prescribed for Patient 7. I am aware that on 28 dates, ANAND or MAKAROVA prescribed morphine and/or oxycodone to Patient 7 and the average MME/day was approximately 160. On 22 of those dates, the prescriptions were for Morphine ER 30 mg tablets and Oxycodone HCL 15 mg tablets.

| Approximate Date Prescription Written | Prescribed Schedule II Controlled Substance | Quantity | Days of Supply | MME/Per Day |
|---|---|---|---|---|
| August 14, 2018 | Morphine sulf ER 30 mg tablet | 60 | 30 | 60.0 MME |
| August 14, 2018 | Oxycodone HCL 15 mg tablet | 120 | 30 | 90.0 MME |
| November 6, 2018 | Morphine sulf ER 30 mg tablet | 60 | 30 | 60.0 MME |
| November 6, 2018 | Oxycodone HCL 15 mg tablet | 120 | 20 | 135.0 MME |
| December 4, 2018 | Oxycodone HCL 15 mg tablet | 120 | 30 | 90.0 MME |
| December 4, 2018 | Morphine sulf er 30 mg tablet | 60 | 30 | 60.0 MME |

80.   Based upon my review of ANAND's foreign travel history and border crossings, I am aware that ANAND was out of the United States from August 26, 2015 through September 8, 2015, September 2, 2016 through September 18, 2016, and March 9, 2017 through March 25, 2017. Based upon my review of PDMP data and claims data from IBC and Medicare, I am aware that ANAND submitted claims for Goody Bags and purportedly wrote prescriptions for controlled substances while he was not in the United States. Specifically, the PDMP data revealed 31 Schedule II controlled substance prescriptions in ANAND's name; Medicare data revealed that ANAND purportedly wrote a total of 67 Goody Bag prescriptions and was paid approximately \$25,494; and IBC data revealed that ANAND prescribed approximately 15 Goody Bag medications and was paid approximately \$13,401.

81.   Between November 1, 2015 and July 17, 2019, ANAND was paid a total of approximately \$4,080,167 by Medicare, OPM, and IBC for medically unnecessary Goody Bag medications. Below is a chart demonstrating the approximate amount paid by each health insurance benefit program:[18]

| Health Insurance | Amount Paid |
|---|---|
| Medicare | \$1,813,425 |
| OPM | \$11,655 |
| IBC | \$2,255,267 |

---

[18] As stated earlier, the DISPENSARIES were not enrolled in OWCP. ANAND has billed OWCP approximately \$27,387 for services and was paid approximately \$12,254. OWCP claims data does not include the name of the prescribing physician. Based upon a review of patient charts seized pursuant to the order requested in this application, we would be able to determine what medications ANAND prescribed to the OWCP claimants.

## VI.     INFORMATION TO BE SEARCHED AND ITEMS TO BE SEIZED

82.     I anticipate executing this warrant under the Electronic Communications Privacy
Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant
to require MDScripts to disclose to the government copies of electronic medical records
maintained under ANAND's account, and other information particularly described in Section I
of Attachment B.  Upon receipt of the information described in Section I of Attachment B,
government-authorized persons will review that information to locate the items described in
Section II of Attachment B.

## VII.    CONCLUSION

83.     Based on the foregoing, there is probable cause to believe that the Subject
Premises contains the items set forth in Attachment B, which constitute evidence, contraband,
and/or instrumentalities of the violations of Title 18, United States Code, § 371 (conspiracy to
defraud the United States), Title 18, United States Code, § 1343 (wire fraud); Title 18, United
States Code, § 1347 (health care fraud); Title 18, United States Code, § 1349 (conspiracy to
commit health care fraud and wire fraud), and Title 21, United States Code §§ 841(a)(1) and 846
(conspiracy to distribute controlled substances), among other statutes.

84.     Based on the information contained herein, as well as Affiant's training and
experience, Affiant believes there is probable cause to believe that ANAND has submitted or
caused the submission of false and fraudulent claims to Medicare, OPM, OWCP, and IBC for the
provision of medically unnecessary prescription medications. Further, there is probable cause to
believe that ANAND knowingly and intentionally distributed a controlled substance outside the
usual course of professional practice and not for a legitimate medical purpose. Based on the
information listed above, as well as Affiant's training and experience, there is probable cause to

believe that there exists at the Subject Premises in Attachment A, items described in Attachment B which will constitute evidence of such crimes.

85.     Based on the forgoing, I request that the Court issue the proposed search warrant.

86.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

ZABRINA ZITTER
Special Agent
U.S. DHHS-OIG

Subscribed and sworn to before me on January  21 , 2020

UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the customer account held in the names of Neil K. Anand, Anand Medical Investment, Institute of Advanced Medicine and Surgery, and Bucks County Pain and Perioperative PLLC doing business as Bucks County Spine and Pain Medicine (the "Account") that is stored at premises owned, maintained, controlled, or operated by MDScripts, a company headquartered at 4735 Walnut Street, Suite 110, Boulder, CO 80301.

## **ATTACHMENT B**

### **Particular Items to be Seized**

### I.      **Information to be disclosed by MDScripts**

To the extent that the information described in Attachment A is within the possession, custody, or control of MDScripts, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or information that have been deleted but are still available to MDScripts, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), MDScripts is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      Any and all records, to include dispensing records (drug name, drug strength, lot number, date of sale, quality sold, quality ordered, unit price, quantity shipped, and/or any other normally listed or recorded per drug transaction), patient treatment records, or other information contained in the Account, maintained by MDScripts.

b.      All records pertaining to communications between MDScripts and any person regarding the Account, including contacts with support services and records of actions taken.

c.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number); and

d.      The types of service utilized by the user.

The Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of Title 18, United States Code, § 371 (conspiracy to defraud the United States), Title 18, United States Code, § 1343 (wire fraud); Title 18, United States Code, § 1347 (health care fraud); Title 18, United States Code, § 1349 (conspiracy to commit health care fraud and wire fraud), and Title 21, United States Code §§ 841(a)(1) and 846 (conspiracy to distribute controlled substances), among other statutes involving ANAND and his co-conspirators.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, HHS-OIG may deliver a complete copy of the disclosed electronic data to the custody and control of agents and attorneys for the government and their support staff for their independent review.

## **CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by MDScripts, and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of MDScripts. The attached records consist of _____. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of MDScripts, and they were made by MDScripts as a regular practice; and

b.      such records were generated by MDScripts electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of MDScripts in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by MDScripts, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____            _____
Date                                                    Signature